## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

PHILLIP DEAN HANCOCK,          :
    Plaintiff,                 :          Civil Case No.
                               :
v.                             :            CIV-23-873-G
                               :
VICKI BEHENNA, Oklahoma        :
County District Attorney;      :          THIS IS A CAPITAL CASE
                               :
WADE GOURLEY, Chief,           :          ***EXECUTION SET FOR***
Oklahoma City Police Department; :        ***November 30, 2023***
                               :
ERIC PFEIFER, Chief,           :
Oklahoma Office of the Chief   :
Medical Examiner;              :
    Defendants.                :
                               :

## COMPLAINT PURSUANT TO 42 U.S.C. § 1983

Meghan LeFrancois, OBA #32643
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520 (phone)
(215) 928-0826 (fax)
Meghan_LeFrancois@fd.org

*Counsel for Plaintiff*

## INTRODUCTION

1.      Plaintiff Phillip Dean Hancock has been convicted of two counts of first degree murder and is currently scheduled to be executed by the State of Oklahoma on November 30, 2023. The State intends to carry out Mr. Hancock's death sentence in spite of the facts that physical evidence is available that has never been DNA tested, and that such testing could establish that Plaintiff was acting in self-defense when he shot the decedents. This suit is brought to prevent Defendants from violating Plaintiff's federal constitutional rights by denying him access to that evidence for purposes of forensic DNA testing.

2.      "Modern DNA testing can provide powerful new evidence unlike anything known before." *Dist. Attorney's Office v. Osborne*, 557 U.S. 53, 62 (2009). The State of Oklahoma collected physical evidence that could have been DNA tested at the time of trial. The State chose not to test that evidence. Mr. Hancock has always maintained that he acted in self-defense when he shot Robert Jett and James Lynch. He has demanded that the evidence be tested to prove he acted in self-defense, but the State has opposed such testing and Oklahoma courts have denied his request for such testing.

3.      As the State has acknowledged, if Mr. Hancock's account is believed, this is "absolutely a clear-cut case of self-defense." At trial, however, a lack of corroborative physical evidence undermined his credibility before the jury, which

convicted Mr. Hancock of two counts of first degree murder and sentenced him to death.

4.      Biological evidence in the State's custody would corroborate Hancock's account while refuting the State's theory of the case. But that evidence has never been DNA tested. Hancock seeks DNA testing of those items—namely: (1) Lynch's fingernail scrapings; (2) Lynch's clothing; (3) Jett's clothing; (4) Jett's wallet; and (5) a letter recovered from the scene—to prove that Jett and Lynch violently assaulted Hancock immediately before, and then while, Hancock shot them in self-defense.

5.      It was undisputed that Hancock went to Jett's house unarmed; Jett was the initial aggressor; Jett ordered Hancock "to get in [a] fucking cage"; Jett, while armed with a gun, bludgeoned Hancock with a breakover bar (a metal tool); Jett was visibly angry and intoxicated on methamphetamines; and Shawn Tarp, a romantic acquaintance of Jett who was also present, knew that Jett "wasn't kidding." Hancock testified that, after he refused to get into the cage, Jett continued to hit him with the breakover bar, while Lynch, who weighed over 300 pounds, "sacked" Hancock, holding him down in a chokehold while Jett beat him.

6.      As a result of this struggle, Hancock's blood and DNA would likely have gotten under Lynch's fingernails and onto Lynch's clothes, onto Jett's clothes and wallet, which was found on the area of the couch where Hancock was beaten

and which appears to have biological stains, and onto a letter found on the breakover bar.

7.      In the State's words, this self-defense case was "about credibility," and the physical evidence presented at trial did not back up Hancock's account. DNA testing could have provided—and still can provide—the evidence to support Hancock's credibility and establish that his account was truthful. Moreover, favorable DNA results would undermine the State's theory of the case, in which Jett retreated and it was "physically impossible" for the obese Lynch to join the attack on Hancock. If that theory were true, Hancock's DNA would not be on Lynch's fingernails or on the decedents' clothes and the other items. And even if the DNA results did not show that Hancock was entirely innocent, it would show, at minimum, that the shootings occurred during a violent struggle initiated by Jett, and that Hancock was therefore not guilty of two counts of premeditated, first degree murder upon which his death sentence was based.

8.      The Oklahoma Legislature has recognized the utility of DNA evidence in the postconviction context. It passed 22 Okla. Stat. 2011 § 1373 *et seq*. (the "Postconviction DNA Act") providing for postconviction DNA testing, at the recommendation of the Oklahoma Justice Commission (OJC), which was established by the Board of Governors of the Oklahoma Bar and had completed a two-year review of the justice system that highlighted problems with DNA evidence,

false confessions, eyewitness identifications, and the use of informants. *See* OJC, *Report to the Okla. Bar Ass'n*, at 5-6 (2013), https://digitalprairie.ok.gov/digital/api/collection/stgovpub/id/238946/download (hereinafter "OJC Report").

9.     In July 2021, Mr. Hancock sought DNA testing under 22 Okla. Stat. 2011 § 1373.2. The district court denied his motion for testing without a hearing. *Hancock v. Oklahoma*, No. CF-2002-3562, Order (Okla. Cty. Dist. Ct. Oct. 26, 2021). The Oklahoma Court of Criminal Appeals (OCCA) vacated the order denying DNA testing and remanded for a hearing. *Hancock v. State*, 514 P.3d 1088 (Okla. Ct. Crim. App. 2022). After holding a limited hearing, the district court adopted the State's proposed findings of fact and conclusions of law verbatim and denied the motion for DNA testing again. *Hancock v. Oklahoma*, No. CF-2002-3562, Findings of Fact and Conclusions of Law (Okla. Cty. Dist. Ct. Oct. 11, 2022) (hereinafter "Findings"). The OCCA affirmed. *Hancock v. State*, No. PC-2022-991, Summary Opinion (Okla. Ct. Crim. App. May 11, 2023) (hereinafter "Summary Opinion").

10.     This action under 42 U.S.C. § 1983 challenges the constitutionality of the Postconviction DNA Act on its face and as applied by the OCCA. Given the unique ability of DNA evidence to shed light on whether Mr. Hancock was defending himself when he shot one or both of the decedents, the State's refusal to

allow Mr. Hancock to test key evidence in its possession denies him due process of law and deprives him of rights guaranteed by the Eighth Amendment.

11.    Defendants' refusal to release the biological evidence for testing violates Plaintiff's Fourteenth Amendment right to due process and his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff requests from this Court an order declaring that Defendants' continued withholding of the evidence violates Plaintiff's constitutional rights and requiring that Defendants release the evidence to Plaintiff under a reasonable protocol regarding chain of custody and preservation of evidence, so that Plaintiff can have the evidence tested at his own expense. Relief is necessary to preserve Plaintiff's liberty interest in accessing the Oklahoma statutory procedure to conduct forensic DNA testing.

## JURISDICTION

12.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202, and under 42 U.S.C. § 1983. *See also Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (convicted state prisoner may seek DNA testing of crime scene evidence in § 1983 action).

## VENUE

13.    Venue lies in this Court under 28 U.S.C. § 1391 because Defendants reside in the Western District of Oklahoma.

## PARTIES

14.     Plaintiff Phillip Hancock is a United States citizen and resident of the State of Oklahoma. He is currently incarcerated, under a sentence of death imposed by the Oklahoma County District Court of Oklahoma (the "trial court") at the Oklahoma State Penitentiary in McAlester, Oklahoma. He is scheduled to be executed on November 30, 2023.

15.     Defendant Vicki Behenna is the District Attorney for Oklahoma County and maintains an office in Oklahoma City. She is being sued in her official capacity. Defendant Behenna has opposed Mr. Hancock's request to conduct DNA testing on the items of evidence at issue in this case. A district attorney who opposes DNA testing is a proper defendant in a § 1983 action seeking DNA testing. *Skinner*, 562 U.S. at 529; *Reed v. Goertz*, 143 S. Ct. 955, 960 (2023) (if federal court finds due process violation, that ruling "would eliminate the state prosecutor's justification for denying DNA testing").

16.     Defendant Wade Gourley is the Chief of the Oklahoma City Police Department (OCPD). Defendant Gourley has custody and/or control of most of the DNA evidence that is the subject of this suit. Defendant Gourley is being sued in his official capacity.

17.     Defendant Eric Pfeifer, M.D., is Oklahoma's Chief Medical Examiner. Defendant Pfeifer has custody and/or control of certain DNA evidence that is the subject of this suit. Specifically, the Oklahoma Office of the Chief Medical

6

Examiner has been storing Mr. Lynch's fingernail clippings/scrapings. Defendant Pfeifer is being sued in his official capacity.

## FACTUAL BACKGROUND

18.     Robert Jett asked Hancock to pick up Hancock's ex-girlfriend, Kathy Quick, from Jett's house. But when Hancock arrived, Quick was not there. Only Jett and James Lynch were in Jett's small house, working on a Harley-Davidson motorcycle. Hancock helped Jett work on the motorcycle in one room, while Lynch sat on the floor sorting parts in another room. At some point, Shawn Tarp arrived.

19.     Jett had been using significant amounts of methamphetamine and became increasingly frustrated and upset. After taking a brief phone call, Jett said he was leaving and began collecting his things. Jett loaded his gun in front of everyone and tucked it into his pants.

20.     Jett wanted cigarettes and Tarp handed him an open pack from the coffee table. Jett started screaming at Hancock, accusing him of taking cigarettes out of the pack. With a metal tool in his hand and the loaded gun in his pants, Jett ordered Hancock to get into a metal cage that was large enough to hold a person. Hancock was unarmed.

*The defense case*

21.     Hancock believed if he was forced into the cage he would be killed. After Hancock refused to get into the cage, Jett swung the metal bar at him, hitting

him in the arm. Hancock jumped up and Jett continued to hit him with the metal bar. Tarp was pushed into a bedroom and then hid in another room.

22.     Lynch, who weighed over 300 pounds, got up and hit Hancock from behind and put his arm around Hancock's neck. Hancock testified that the upper part of Lynch's body was on top of him, holding him down on a couch, while his legs were stuck over the arm of the couch. Meanwhile, Jett was bludgeoning Hancock with the metal bar.

23.     Hancock managed to get Jett's gun. Hancock believed he had to use deadly force to save his own life. He fired multiple shots and struck Jett. Jett dropped the tool and ran out of the room.

24.     After Hancock shot Jett, Lynch still had an arm wrapped around Hancock's neck. Hancock shot Lynch once in what he thought was Lynch's chest or stomach. Lynch pulled Hancock off the couch with him, and Hancock fired again as he was standing up. All of this took about ten seconds.

25.     Hancock heard a noise in the back room and, not knowing where Jett went, thought Jett might be getting an AR-15 assault rifle, which Hancock knew Jett owned. Hancock thought he had to get out of the house and saw the back door open. It was "pitch black" outside. Just after he got outside, he ran into Jett, who was kicking at him, and Hancock fired again in a knee-jerk reaction.

26.     Hancock went back into the house, saw Tarp, and told her that he was not going to hurt her. He asked her what she wanted to do, and she said that she wanted to go home. He told her that he would leave and then she could leave, and she agreed.

27.     Hancock was "cut all over when [he] left [the] house." He went to a house that his ex-girlfriend, Quick, rented to a man named Paul Gould. Gould gave Hancock a wrap for his injured ribs and a t-shirt to clean his bloody hands. Hancock was walking with a limp and had bloody knees. Hancock seemed to Gould to be in pain when he breathed. An x-ray of Hancock's chest taken six months later showed that Hancock had two rib fractures, which appeared to be about six months old.

*The State's case*

28.     Although there was no dispute at trial that Jett was the initial aggressor and the only person armed with a gun, the State's theory was that Jett retreated after one swing and did not attack Hancock with the metal tool again. The State denied that any struggle occurred in the living room on or near the couch. The State also elicited testimony from Tarp that she did not see any fight on the couch, though she admitted she was unable to see the fight.

29.     The prosecution offered testimony from a nurse that Lynch was obese and diabetic, had one leg that was shorter than the other, had had a hip replacement, and limped when he walked. The State argued that Lynch never intervened, going

so far as to say that "it would have been physically impossible" for him to go from lying on the floor to holding Hancock in a headlock on the couch. The prosecution argued that, had Lynch gotten up as Hancock suggested, the momentum would have propelled all three men into another room.

30.    The State argued that the absence of gunpowder residue around Lynch's chest wound disproved Hancock's account of shooting Lynch at close range, i.e., within 36 inches. The State suggested that the absence of this physical evidence was reason to discredit Hancock's account entirely, including his testimony that he was held on the couch and beaten with the metal tool. In fact, the State disputed whether Hancock was injured at all, despite his blood being found at the scene.

31.    In closing arguments, the State told the jury, "[T]his case is about credibility." The State argued the jury would "have to disbelieve [Tarp] in order to believe the defendant." Without critical physical evidence to corroborate Hancock's account, the jury largely credited the State's accusations over Hancock's account. The jury convicted Hancock of two counts of first degree murder and sentenced him to death. But the jury acquitted Hancock of pointing a firearm at Tarp, rejecting her testimony that, before he left the house, he held the gun to her face.

*Evidentiary hearing on DNA evidence*

32.    Mr. Hancock alleged that DNA testing of physical evidence in the State's possession would corroborate his account of the attack by Jett and Lynch. Specifically, Lynch's fingernail clippings/scrapings, Lynch's and Jett's clothing, Jett's wallet, and a letter found on the metal bar were collected during the police investigation and likely contain biological evidence that would confirm his account of a physical struggle. DNA testing of these items would support Hancock's self-defense claim that Jett beat Hancock with the metal tool, that Lynch intervened, and that Hancock was severely injured during the struggle. At minimum, DNA testing would undermine Hancock's convictions of two counts of first degree murder and his death sentence.

33.    Before the evidentiary hearing, Mr. Hancock requested an additional day to present a forensic pathologist, whose analysis would rebut the determination that there was no gunpowder residue on Lynch's wounds. The district court denied the request.

34.    At the evidentiary hearing, Hancock demonstrated that favorable results would show significant amounts of his blood and DNA on the items he asked to have tested. Laura Schile, an expert in forensic science and crime scene analysis, testified that Hancock's blood and DNA could have spattered on and transferred to the items as a result of Hancock being beaten with a metal tool and choked. She testified that skin cells—i.e., DNA—are transferred by contact when there is force,

friction, and rubbing. And substantial amounts of DNA are transferred when the biological source of DNA is sweat or blood as compared to skin cells.

35.    The State examined Schile regarding alternate explanations for why Hancock's DNA might be present at the scene or on the items, including that he was present in the house and helped Jett work on a motorcycle. She testified unequivocally that those theories of DNA transfer could not explain large quantities of Hancock's DNA, much less his blood, on the requested items, whereas direct contact would.

36.    With regard to Lynch's fingernail clippings/scrapings, Schile identified fingernails as a rich source of DNA evidence. It is *likely* that Hancock's DNA would have deposited under Lynch's fingernails as a result of being grabbed and held in a chokehold, but it is *unlikely* that DNA would be under the fingernails as a result of Lynch merely being present in the same room as Hancock, or even handling the same tools as Hancock. Schile likewise identified the wallet as appropriate for DNA testing because it had stains consistent with biological material and was found on the area of the couch where Hancock reported being beaten. Regarding the letter, Schile explained that if the metal tool "had biological fluid on it, or biological substance, then that letter [found on the tool] could be picking that biological substance up." As a forensic scientist and based on the facts of the case, she would

have been very interested in the metal tool, but law enforcement did not preserve it. The letter offers the next best source of DNA to shed light on what occurred.

## PROCEDURAL BACKGROUND

37.    After a trial in the Oklahoma County District Court before the Honorable Susan P. Caswell, a jury convicted Hancock of two counts of first degree murder and a firearm possession count. The State argued a death sentence was appropriate based, inter alia, on Hancock's alleged intent and on the jury verdicts convicting Hancock of two counts of first degree murder. Hancock was sentenced to death on the murder counts and to ten years' imprisonment for the firearm possession count. The OCCA affirmed Hancock's murder convictions and death sentences but reversed his conviction on the firearm possession count. *Hancock v. State*, 155 P.3d 796 (Okla. Ct. Crim. App. 2007).

38.    Hancock sought state postconviction relief. The OCCA denied his requests without an evidentiary hearing. In 2008, Hancock filed a federal habeas petition in the District Court for the Western District of Oklahoma, which was denied, and the Tenth Circuit affirmed. *Hancock v. Trammell*, 798 F.3d 1002, 1006 (10th Cir. 2015).

39.    On December 10, 2019, Laura Schile, an expert in forensic investigations and former OCPD DNA analyst, visited the OCPD to view the physical evidence in the case. Schile identified evidence that may contain biological

material, and which could provide significant DNA evidence that supports Hancock's self-defense claims.

40.    On July 8, 2021, Hancock filed a Motion and Brief in Support of Forensic DNA Testing Pursuant to 22 Okla. Stat. § 1373.2 of the Postconviction DNA Act.[1] On October 25, 2021, the State filed an opposition. The next day, the Honorable Cindy Truong of the Oklahoma County District Court denied Hancock's motion without a hearing. Hancock appealed.

41.    The OCCA found that the trial court erred in failing to hold a hearing on Hancock's motion as required by law, and therefore vacated the order denying DNA testing and remanded for a hearing. *Hancock v. State*, 514 P.3d 1088 (Okla. Ct. Crim. App. 2022).

42.    The trial court held an evidentiary hearing. The parties stipulated to facts establishing that Hancock had satisfied 22 Okla. Stat. §§ 1373.4(A)(2)-(5), leaving only § 1373.4(A)(1), regarding the materiality of favorable DNA results, in dispute. Following the hearing, the parties submitted proposed findings of fact and conclusions of law on October 7, 2022. On October 11, 2022, the district court

---

[1] Mr. Hancock also filed a successive state postconviction petition in the OCCA, based on new evidence that Jett intended to lure Hancock to his house and assault him. The OCCA denied that petition without a hearing on May 11, 2023. *Hancock v. State*, No. PCD-2021-616, Opinion (Okla. Ct. Crim. App. May 11, 2023).

adopted the State's proposed findings of fact and conclusions of law verbatim and denied Hancock's motion for DNA testing.

43.     Mr. Hancock appealed. On May 11, 2023, the OCCA affirmed.

## CLAIMS FOR RELIEF

44.     Mr. Hancock re-alleges and incorporates herein by reference all the allegations contained in the preceding paragraphs of this Complaint.

### First Claim for Relief: Denial of Due Process

45.     Pursuant to the Postconviction DNA Act, when an individual sentenced to death, such as Mr. Hancock, presents a motion that requests DNA testing of biological material that both still exists in a condition which makes testing possible and could yield exculpatory results, he or she is entitled to have the evidence tested. 22 Okla. Stat. § 1373.4. If the results of the testing are favorable to the prisoner, the trial court must schedule a hearing to determine what relief to grant. *Id.* § 1373.5.

46.     Exculpatory DNA results can be used under Oklahoma law to obtain relief in the form of vacation of the judgment of conviction, a new trial, discharge from custody, or additional discovery on matters related to the DNA test results. *Id*. However, the Oklahoma DNA statute does not provide for relief from a death sentence where DNA evidence would undermine the basis for such a sentence. *See id*.

47.     By contrast, previously unavailable evidence that requires vacation of *either* the conviction or sentence provides a basis for postconviction relief under Oklahoma law. 22 Okla. Stat. §§ 1080, 1080.1.A.5. Exculpatory DNA results may also be considered by the Pardon and Parole Board and the Oklahoma Governor in a request for executive clemency. *See* Okla. Const. Art. 6, § 10 (granting broad powers of executive clemency to Pardon and Parole Board and Governor).

48.     Because the State of Oklahoma has created a procedure through which convicted persons can obtain DNA testing and then utilize exculpatory results from that testing to secure relief of the types set forth in sections 1373.5 and 1080, executive clemency and potentially other relief from their convictions and death sentences, the process employed by the State for obtaining access to DNA must not violate fundamental fairness. *See Osborne*, 557 U.S. at 69; *Skinner*, 562 U.S. at 530-33 (recognizing cognizability of claim that Texas' DNA statute, as construed by Texas courts, denied plaintiff procedural due process). And because the State of Oklahoma has created a procedure through which convicted and death-sentenced persons can obtain relief from their sentences based on new evidence, 22 Okla. Stat. §§ 1080, but then denies those persons access to DNA evidence in its possession, *id.* §§ 1373.4.1 & 1373.5, the procedures violate due process. *See Gutierrez v. Saenz*, 565 F. Supp. 3d 892, 910 (S.D. Tex. 2021).

49.    The Postconviction DNA Act on its face and as construed by the OCCA violates fundamental fairness. On its face and as construed by the OCCA, the statute effectively precludes DNA testing, including DNA testing to prove that a convicted person is undeserving of or ineligible for a death sentence.

50.    Section 1373.4.A.1 provides for testing only if the court finds a "reasonable probability that the petitioner would not have been convicted if favorable results had been obtained through DNA testing at the time of the original prosecution." By its own terms, the statute requires the court to assume favorable results of testing, which is how other states have interpreted similar provisions. *See, e.g.*, *Powers v. State*, 343 S.W.3d 36, 55 (Tenn. 2011) ("'the trial court should postulate whatever realistically possible test results would be most favorable to [the] defendant in determining whether he has established' the reasonable probability requirement") (quoting *State v. Peterson*, 836 A.2d 821, 827 (N.J. Super. Ct. App. Div. 2003)); *accord State v. Dupigney*, 988 A.2d 851, 864 (Conn. 2010); *Lambert v. State*, 435 P.3d 1011, 1019 (Alaska Ct. App. 2018).

51.    Applying a *less than* favorable presumption would prematurely cut off the inquiry reserved for section 1373.5, which allows the trial court to grant appropriate relief *if the actual results are in fact favorable*. 22 Okla. Stat. § 1373.5. Only by assuming the most favorable hypothetical result can courts give meaning to the legislature's intent to provide access to DNA testing to "assure that wrongful

convictions do not go uncorrected." OJC Report at 24-25; *see also Flowers v. State*, 387 P.3d 947, 949 (Okla. Ct. Crim. App. 2016) (acknowledging the court's "solemn obligation to carry out th[e] legislative mandate" "'to ensure the fair and effective use of [DNA] testing within the existing criminal justice framework'") (quoting *Osborne*, 557 U.S. at 62).

52.    Favorable DNA results here would show significant quantities of Hancock's blood and DNA present under (1) Lynch's fingernails; and on (2) Lynch's clothing; (3) Jett's clothing; (4) Jett's wallet; and (5) the letter found on the breakover bar. Based on Hancock's account of the events and Schile's testimony regarding the way DNA transfers, Hancock's blood and DNA could be present in significant quantities on these items. Blood spatter and other DNA transfer would likely result from the breakover bar hitting Hancock's hands, arms, and/or legs. Far more DNA is transferred by contact with force, friction, and/or rubbing, as may be the case in a struggle, than when DNA is transferred by light touch. Greater force or friction may also be accompanied by sweat, which contains large quantities of DNA. In addition, blood transfers more DNA than skin cells. Thus, the struggle described by Hancock likely resulted in the transfer of significant blood and DNA material.

53.    Favorable results finding significant amounts of Hancock's blood and DNA on these items would therefore confirm that the decedents violently struggled with Hancock, used weapons against him, and injured him. Unlike typical cases

where favorable results tend to exclude the petitioner, a self-defense petitioner concedes that he was present but asserts that no crime was committed because he acted in lawful self-defense. The DNA statute applies equally to these cases. Favorable results are material where a petitioner, like Hancock, "had, in actuality, acted in lawful self-defense." *State v. Braa*, 410 P.3d 1176, 1181 (Wash. Ct. App. 2018); *see also* 21 Okla. Stat. § 733(A)(2) (self-defense is a justification to homicide).

54.    The presence of Hancock's blood and DNA under Lynch's fingernails and on his clothing would provide powerful evidence that Lynch attacked Hancock before Hancock shot him. Hancock testified that Lynch held him in a choke hold. In contrast, the presence of Hancock's DNA under Lynch's fingernails or on his clothing would undermine the State's case that Lynch never intervened in the fight between Jett and Hancock and instead was shot for being in the wrong place at the wrong time.

55.    Further, if the metal tool had biological material on it from Hancock's wounds, the letter could have picked it up. The State has acknowledged that favorable results from the letter would likely be due to DNA transfer from the tool. *See* Resp. Br. at 33 n.9 (Apr. 21, 2022), *Hancock v. Oklahoma*, No. PC-2021-1256 (May 11, 2022). Thus, the presence of Hancock's blood and DNA on the letter would corroborate Hancock's testimony that Jett beat him with the metal tool. Finally, the

presence of Hancock's blood and DNA on Jett's clothing and wallet would corroborate Hancock's testimony that Jett beat him while he was being held down on the couch. When Hancock was being beaten, his blood and DNA could have spattered and transferred to Jett's clothing and the wallet. Indeed, Jett's wallet, which was found on the side of the couch where Hancock's legs were beaten, appeared to have stains consistent with blood or other biological material on it. Favorable results would show that Hancock was engaged in a struggle with *both* decedents and was injured by them, facts which the State disputed and which cannot be reconciled with the State's theory of the case.

56.     The OCCA, however, has ruled that courts in Oklahoma need not assume favorable results, but can deny testing based on the assumption that testing will *not* produce favorable results.

57.     The trial court ruled that DNA evidence confirming a struggle could not overcome contradictory evidence from the surviving eyewitness and the placement of objects at the crime scene. Findings at 7-8. Thus, Petitioner's account of what happened was "implausible." *Id.* at 7. However, in every case in which postconviction DNA testing is conducted, the petitioner was convicted at trial by evidence beyond a reasonable doubt. Thus, if the presence of contradictory evidence is grounds for denying DNA testing, no postconviction DNA testing will ever take place. And a court's speculation as to the likelihood that testing *will* produce a

particular result cannot reasonably be a basis for concluding that testing that *does* produce that result would not change the outcome at trial.

58.     The trial court also concluded that favorable results "would not corroborate Petitioner's claim of self-defense" because "there were means for Petitioner's DNA to end up on the subject items outside of Petitioner's account." Findings at 8. But that is true only if it is assumed that no blood and only trace levels of Hancock's DNA were transferred; i.e., the court assumed only slightly favorable results, not the highly favorable results that Hancock alleges DNA testing will show. *See id.* (assuming Hancock's DNA could have transferred to the items as a result of the decedents having touched things that Hancock touched, including when Jett and Hancock worked on a motorcycle together, or as a result of Hancock being present at Jett's house previously). Moreover, there are no such innocent explanations for Hancock's blood being underneath Lynch's fingernails, for example, or on his clothes. The court failed to assume DNA results as favorable as Hancock alleged they will be.

59.     The OCCA fully adopted the trial court's findings, which had verbatim adopted the State's proposed findings. In particular, the OCCA approved the finding that "Petitioner's account is in conflict with both physical evidence and the testimony of the only other eyewitness to the shooting presented at trial." Summary Opinion at 3-4. It affirmed the denial of relief on that basis. *Id.* at 4.

60.     Realistically, this makes it virtually impossible for any defendant ever to obtain DNA testing under the Postconviction DNA Act. If there were a complete absence of inculpatory evidence, presumably the defendant would not have been convicted in the first place. Exculpatory DNA evidence will always be "in conflict" with the inculpatory evidence admitted at trial.

61.     The OCCA has applied the different outcome requirement so broadly that it can be used to deny virtually all requests for DNA testing. The OCCA did not dispute that testing may show conclusively that Mr. Hancock was injured in a struggle with the decedents. Instead, it simply asserted that such testing would not change the outcome of the trial. Even if it would still technically be possible to convict Mr. Hancock, however, exculpatory test results would so dramatically alter the evidence that a different outcome would be highly likely. The OCCA's contrary ruling, in the face of the evidence outlined above, construed the Postconviction DNA Act in such a way that it is virtually impossible for anyone convicted to obtain DNA testing under the statute.

62.     Further, the Postconviction DNA Act explicitly limits testing to requests that are made "to demonstrate the innocence of the convicted person . . . ." 22 Okla. Stat. § 1373.4.A.2. This means that a defendant can never obtain testing in order to establish that he is undeserving of or ineligible for the death penalty, and thus "'actually innocent' of the death penalty to which he has been sentenced."

*Sawyer v. Whitley*, 505 U.S. 333, 335 (1992). The execution of a person who is innocent of the death penalty, however, would be a fundamental miscarriage of justice. *See id.* at 339 (actual innocence of crime or death penalty is a miscarriage of justice); *id.* at 345 (defining innocence of death penalty as a "showing that there was no aggravating circumstance or that some other condition of eligibility had not been met"). On its face, the Postconviction DNA Act does not permit DNA testing to establish that a defendant is ineligible for the death penalty.

63.     Similarly, on its face, the Postconviction DNA Act also does not permit DNA testing to establish that one or more of the aggravating circumstances are invalid, that mitigating circumstances exist, or that the death sentence is otherwise unjust or unwarranted.[2] Here, for example, the State sought and obtained a death

---

[2] A substantial number of state statutes expressly provide for DNA testing where the results would likely change the defendant's sentence, in all cases or at least in capital cases. *See* Cal. Penal Code § 1405(g)(5) (West) (providing for testing where results would raise reasonable probability of more favorable result as to conviction or sentence); Fla. Stat. Ann. § 925.11(f)(3) (West 2006) (reasonable probability of acquittal or a lesser sentence); Haw. Rev. Stat. Ann. § 844D-123(b) (West) (reasonable probability of more favorable verdict or sentence); Ind. Code Ann. § 35-38-7-7 (West) (reasonable probability petitioner would not have received as severe a sentence); Kan. Stat. Ann. § 21-2512(c) (West 2013) (testing of evidence relevant to claim petitioner was wrongfully convicted or sentenced); Ky. Rev. Stat. Ann. § 422.285(6) (West 2013) (court may order testing if reasonable probability that verdict or sentence would have been more favorable); Md. Code Ann., Crim. Proc. § 8-201(6) (West 2018) (reasonable probability testing will produce evidence relevant to claim of wrongful conviction or sentencing); Miss. Code Ann. § 99-39-5(1)(f) (West) (reasonable probability petitioner would have received lesser sentence); Neb. Rev. Stat. Ann. § 29-4120(5)(c) (West 2015) (evidence relevant to claim petitioner was wrongfully sentenced); 42 Pa. Consol. Stat. Ann. § 9543.1(d)(2)

sentence based largely on Plaintiff's convictions for murdering *both* Jett and Lynch. DNA evidence demonstrating a violent struggle with Lynch, however, would undermine the State's theory of murder wherein Lynch was an innocent bystander, even if it did not provide sufficient basis to overturn the murder conviction relating to Jett. The absence of two murder convictions, in turn, would have undermined the State's case for sentencing Plaintiff to death. And DNA evidence demonstrating a violent struggle with either decedent would demonstrate the viability of a heat of passion or other voluntary manslaughter defense to reduce the degree of the homicides, or to warrant a lesser sentence.

64.    Although Plaintiff cannot obtain DNA testing to prove that he is ineligible for the death sentence or that a death sentence is unwarranted, Oklahoma law allows a convicted defendant to obtain postconviction relief on those grounds, as long as his claim is based on new law or on facts that could not previously have

---

(West) (testing in a capital case if reasonable possibility of innocence of aggravating circumstance or evidence of mitigating circumstance); 10 R.I. Gen. Laws Ann § 10-9.1-12(b) (West) (discretionary testing where reasonable probability results would have reduced sentence); Tenn. Code Ann. § 40-30-305(1) (West) (discretionary testing if reasonable probability sentence would have been more favorable); Utah Code Ann. § 78B-9-301(2)(f) (West) (reasonable probability defendant would have received lesser sentence); Vt. Stat. Ann. tit. 13 § 5566(a)(1) (West) (same); W. Va. Code Ann. § 15-2B-14(c)(1)(B) (West) (reasonable probability verdict or sentence would be more favorable); Wyo. Stat. Ann. § 7-12-305(d)(ii) (prima facie showing in capital case of innocence of aggravating circumstance or establishing a mitigating circumstance).

been discovered through due diligence. *See* 22 Okla. Stat. § 1080 (postconviction relief available based on, inter alia, "evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice"); *id*. § 1080.1.A.5 (postconviction claim must be filed within one year of "date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence"); *Pickens v. State*, 126 P.3d 612, 614-15 (Okla. Ct. Crim. App. 2005) (petitioner successfully brought claim of ineligibility for death sentence in successive postconviction petition).

65.     Thus, Plaintiff could bring a postconviction claim predicated on newly available DNA evidence, alleging that the new evidence entitles him to relief from his death sentence. But the Postconviction DNA Act precludes him from obtaining the evidence in the first place. This violates due process. *See Gutierrez*, 565 F. Supp. 3d at 910.

66.     By refusing to release the biological evidence for testing, and thereby preventing Plaintiff from gaining access to exculpatory evidence that could have led to his acquittal on one or both first degree murder counts, and/or demonstrated that he is not death eligible, and/or rebutted the state's aggravating evidence, and/or established mitigating circumstances, Defendants have deprived Plaintiff of his liberty interests in utilizing state procedures to obtain an acquittal and/or reduction

of his sentence, in violation of his right to due process of law under the Fourteenth Amendment to the Constitution of the United States.

**Second Claim for Relief: Access to Courts**

67.    Mr. Hancock re-alleges and incorporates herein by reference all the allegations contained in the preceding paragraphs of this Complaint.

68.    Mr. Hancock has a fundamental right to access the courts, rooted in the First and Fourteenth Amendments, which requires that the states make available the tools necessary for prisoners to obtain meaningful access to available judicial remedies. State law must ensure that prisoners like Mr. Hancock have meaningful access to postconviction remedies in order to vindicate this right. *Cf. Bounds v. Smith*, 430 U.S. 817, 828 (1977) (holding that prison authorities are required to provide inmates meaningful legal assistance or resources to effectuate their constitutional right of access to courts).

69.    As alleged above, Mr. Hancock has available remedies under Oklahoma law for access to postconviction DNA testing, to judicial relief from his conviction and death sentence, and to executive clemency, based on the exculpatory results of such testing. And, as alleged above, Oklahoma's restrictive procedure for obtaining access to DNA testing under the Postconviction DNA Act, and the OCCA's interpretation thereof, is not adequate, meaningful, or effective.

70.    Mr. Hancock incurred actual injury when the OCCA denied his request for DNA testing that could potentially produce exculpatory and mitigating evidence, and thus provide him with relief from his convictions and death sentence.

71.    As stated above, the OCCA's unreasonable interpretation of the Postconviction DNA Act has prevented Mr. Hancock from gaining access to exculpatory evidence that could demonstrate that he is not guilty of first degree murder, and that he is not eligible for or deserving of the death penalty. These failures have deprived Mr. Hancock of his fundamental right to access the courts under the First and Fourteenth Amendments.

### Third Claim for Relief: Cruel and Unusual Punishment

72.    Mr. Hancock re-alleges and incorporates herein by reference all the allegations contained in the preceding paragraphs of this Complaint.

73.    The Eighth Amendment's prohibition on cruel and unusual punishment prevents the execution of a prisoner, like Mr. Hancock, who has viable claims of innocence of the death penalty, or seeks to establish mitigation related to the circumstances of the offense, without first affording the opportunity to prove innocence or mitigation. On its face, the Postconviction DNA Act bars DNA testing where the evidence could change the outcome at capital sentencing, even if it did not also change the outcome at trial. Because Oklahoma law does not allow for DNA

27

testing under such circumstances, the Postconviction DNA Act violates the Eighth Amendment's prohibition on cruel and unusual punishment.

**Request for Injunctive Relief: Release of Evidence for Testing**

74.    For the reasons stated above, the Constitution requires declaratory relief that the denial of DNA testing to Mr. Hancock violates the Constitution and that Mr. Hancock be afforded the opportunity to conduct DNA testing on the evidence identified in this Complaint. Further, Mr. Hancock requests injunctive relief compelling those Defendants who are custodians of the evidence identified in this Complaint to release the evidence for DNA testing. Accordingly, Mr. Hancock asks this Court to grant prospective injunctive relief compelling the Defendants to release the evidence identified in this Complaint so that the requested DNA testing can be accomplished.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court provide relief as follows:

1.     A declaratory judgment that the Postconviction DNA Act, as applied

by the OCCA, is unconstitutional because:

     a.     It imposes a fundamentally unfair limitation, in violation of due process and the First Amendment, upon Plaintiff's access to statutory remedies available under Oklahoma law, and deprives Plaintiff of adequate, effective, and meaningful access to such remedies. Those remedies include: (1) the statutory right to access postconviction DNA testing and obtain relief based on favorable testing pursuant to the Postconviction DNA Act; (2) the statutory right to habeas relief for constitutional violations pursuant to sections 1080 and 1080.1A.5 based on exculpatory DNA evidence; and (3) executive clemency based on exculpatory and/or mitigating DNA results.

     b.     It denies Plaintiff the protection of the Eighth Amendment of the Constitution, which requires that death sentences be reliable, and therefore guarantees persons facing the death penalty access to test evidence where exculpatory results can prove innocence of the crime, innocence of the death penalty, or relevant mitigating factors concerning the circumstances of the offense.

2.     A preliminary and permanent injunction requiring Defendants to

produce and release for DNA testing the evidence set forth below, pursuant to an

appropriate protocol regarding chain of custody and preservation and return of such

evidence after testing has been completed, specifically: (1) all clothing recovered

from Robert Jett; (2) all clothing recovered from James Lynch (3) all fingernail

scrapings and/or fingernail clippings previously recovered from James Lynch; (4)

Robert Jett's wallet and its contents; and (5) the letter found on the breakover bar.

Respectfully submitted,


/s/ Meghan LeFrancois
Meghan LeFrancois, OBA #32643
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520 (phone)
(215) 928-0826 (fax)
Meghan_LeFrancois@fd.org